IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

PITTACK V. PITTACK

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JASON C. PITTACK, APPELLEE,

V.

JASMINE E. PITTACK, APPELLANT.

Filed March 12, 2019.    No. A-18-487.

Appeal from the District Court for Douglas County: W. RUSSELL BOWIE III, Judge. Reversed and remanded with directions.

Frederick D. Stehlik, Zachary W. Lutz-Priefert, and Margaret A. Mark, of Gross & Welch, P.C., L.L.O., for appellant.

Benjamin M. Belmont and Wm. Oliver Jenkins, of Brodkey, Cuddigan, Peebles, Belmont & Line, L.L.P., for appellee.

MOORE, Chief Judge, and BISHOP and WELCH, Judges.

BISHOP, Judge.

Jason C. Pittack filed a complaint to dissolve his marriage to Jasmine E. Pittack in July 2015. The transcript provided to this court contains almost 600 pages of various motions and orders generated by disputes arising between the parties during the pendency of the action. And although millions of dollars of assets were at stake, Jasmine was not present nor represented by an attorney on the day scheduled for trial. Her attorneys were allowed to withdraw on an oral motion, without Jasmine present, just 1 month before trial. A divorce decree was entered by the Douglas County District Court on March 15, 2017.

Jasmine, with new counsel, subsequently filed a motion to vacate the decree based on various grounds, including that (1) she did not receive notice that the original trial date had been advanced to a month earlier than previously scheduled, (2) she was not aware until the summer of

2017 that a decree had been entered dissolving her marriage, (3) she should have been appointed a guardian ad litem (GAL) when there were obvious issues concerning the soundness of her mind, (4) the parenting plan ordered by the court was not in compliance with the law, and (5) the divorce decree was procured by fraud because Jason failed to disclose all marital assets. Jasmine appeals from the district court's denial of her motion to vacate. We conclude the district court abused its discretion by denying Jasmine's motion to vacate; therefore, we reverse, and remand with directions.

BACKGROUND

After Jason filed for divorce in July 2015 and Jasmine filed an "Answer and Counter-Complaint," a temporary order was entered in November giving the parties joint legal and physical custody of their two daughters (ages 7 and 9 at the time), but with Jasmine awarded "primary physical custody." Jason was ordered to pay $6,009 per month in child support and $5,000 per month in alimony. He was also ordered to pay $10,000 into Jasmine's attorney's trust account for Jasmine's attorney fees and another $25,000 for "expert costs." The child support calculation attached to the temporary order reflects a monthly gross income of $132,150 for Jason and $1,200 for Jasmine. Jasmine's attorney at that time (first attorney) filed a motion to withdraw on November 30, indicating that Jasmine wanted different counsel. The order granting the first attorney's withdrawal was entered on December 11.

On January 6, 2016, Jason's attorney filed a motion for hair follicle testing of Jasmine. On January 11, Jasmine's two new attorneys, a female attorney and a male attorney (second attorneys), entered their appearances. A "Second Temporary Order" entered on February 26 states that Jasmine tested positive for methamphetamine use, but that there was no evidence this had affected the children; joint custody was left in place. Another request for fees was made, and the district court ordered Jason to deposit into the trust account of Jasmine's female second attorney the sum of $50,000 for attorney fees and $50,000 for expert witnesses. Jasmine's motion for a GAL for the children was denied. The parties were ordered to split the obligation to pay various expenses for the children. Also on February 26, Jasmine's second attorneys filed a motion to compel Jason to respond to discovery requests which he had been court-ordered to respond to months earlier.

In June 2016, Jasmine's second attorneys filed a motion seeking to continue trial (scheduled for November) "due to [Jason's] reluctance to provide financial information pertaining to his Trust(s) and the difficulty [Jasmine] has had in obtaining Trust information that has been previously Ordered to be disclosed." In July, the district court ordered Jason to provide the trust information to Jasmine's attorneys and, if necessary, to an expert. The district court also ordered Jasmine to sign paperwork for a realtor to get the family residence listed for sale. On July 18, Jason filed an "Amended Motion" asking for Jasmine to submit to another hair follicle test.

The second attorneys filed motions to withdraw as Jasmine's counsel on August 5, 2016. An order granting their withdrawal was entered on August 11. The next day, an order was entered requiring Jasmine to have a hair follicle test completed by August 19. Also, Jasmine was given 30 days to find new counsel. On August 23, an ex parte order was entered granting Jason full temporary custody of the children, with Jasmine limited to supervised parenting time.

On September 13, 2016, following a hearing at which Jasmine was present with two new attorneys (third attorneys) (although no formal appearance had yet been filed), the court continued

custody of the children with Jason and terminated his child support obligation. The matter was continued to September 29. On September 30, an order was entered stating that Jasmine tested positive for methamphetamine on August 24, and that she was in contempt of the court's prior orders. Jasmine was to appear on November 21 for sentencing, but could purge herself of the contempt if she did weekly urinalysis testing. Finally, upon Jason's "verbal motion to reduce his support obligation," the court reduced Jason's temporary alimony obligation from $5,000 to $3,500 per month beginning October 1.

On October 7, 2016, Jason filed a motion to exclude Jasmine from the family residence and sought an order requiring Jasmine to sign the paperwork necessary to effectuate the sale of the residence; closing was scheduled for October 18. Jason claimed he appeared at the family residence with moving trucks to remove his and the children's personal property, but that Jasmine refused him entry and called the police. An order was entered directing that Jasmine remove herself from the family residence by no later than October 17 and to sign any necessary paperwork to effectuate the sale of the home. Jason was authorized to access the home on October 13 to retrieve property; the proceeds of the home sale were to be deposited into a restricted interest bearing bank account.

On November 15, 2016, an entry of appearance was filed by one of the third attorneys, and on November 21, Jasmine apparently had not purged herself of the court's September 30 contempt order and was sentenced to jail for 2 days. On November 28, an "Amended Order for Trial" was filed, showing trial scheduled for April 4, 2017, at 9 a.m. The certificate of service reflects service of this order on Jason's attorney and Jasmine's third attorney who had filed an entry of appearance. On November 30, 2016, Jason's attorney filed a motion seeking to eliminate his alimony obligation because, to his "knowledge and belief," Jasmine "may be, either directly or indirectly, expending her support to foster her use of illegal substances." Jason also alleged he had to "continually remit payments to third party creditors as a result of [Jasmine's] actions," such as her refusal to return a cable box or pay on various expenses for which she was responsible.

On December 16, 2016, Jasmine filed a "Motion for Order Under [Neb. Rev. Stat. § 42-362 (Reissue 2016)]." (We note that § 42-362 states that when the pleadings or evidence in a domestic relations case indicate that a spouse is mentally ill, "a [GAL] or an attorney, or both, shall be appointed to represent the interests of such spouse." If the parties are unable to pay for the fees associated with such an appointment, they can be taxed as costs by the court and they will be paid by the county. The statute further provides for "support and maintenance of such mentally ill person" as the court may deem necessary and proper. *Id*.) In her motion for an order pursuant to § 42-362, Jasmine set forth, in part, that: the pleadings indicated that she had to submit to hair follicle testing, she had been found in contempt for noncompliance with drug testing and the court reduced her spousal support, she was excluded from the family residence, she was sentenced to 2 days in jail for her noncompliance with drug testing, and Jason was requesting a reduction in his support obligations based upon allegations that Jasmine was using her support to foster her use of illegal substances and was failing to make payments to creditors. Jasmine requested that her spousal support "be reset" because she wanted to enroll in a course of rehabilitation that would require her to leave Nebraska for an extended period of time and she needed funding to enter such a program. She also noted her possession of a "significant amount of items of personal property from the marital estate" which required funds for her to protect those assets. Jasmine claimed she

would be unable to pay the fees for an attorney appointed pursuant to § 42-362. Jasmine's prayer requested that the court: authorize her extended absence from Nebraska to complete a rehabilitation program, appoint her an attorney pursuant to § 42-362, reassess her spousal support amount, and order Jason to pay the expenses for her rehabilitation.

A couple hours after Jasmine's attorney filed the § 42-364 motion on December 16, 2016, Jason's attorney filed a "Notice of Deposition," which provided that Jason's attorney would be taking Jasmine's deposition on December 28 at the office of Jason's attorney. On December 29, Jason field a "Motion to Compel and for Sanctions," as a result of Jasmine not showing up for the deposition.

On January 12, 2017, an order was entered stating that "the motion to appoint a [GAL] and for other relief for [Jasmine] is denied without prejudice." On the same day, Jason filed another notice to take Jasmine's deposition.

On January 18, 2017, an order was entered again denying Jasmine's motion "for appointment of a [GAL]." The order also granted Jason's "Motion to Compel" and ordered Jasmine to appear for the deposition scheduled for January 25. Jason's motion for sanctions was granted, and Jasmine was "sanctioned the sum of $500.00," which was to be deducted from her February alimony payment.

On January 27, 2017, Jason filed a motion requesting an order holding Jasmine in contempt for violating the court's January 18 order (ordering her to appear for her deposition). Jason further requested "an appropriate sanction" be entered, including that "a Default Judgment of a Decree of Dissolution be entered," Jasmine "be prohibited from presenting any evidence in opposition to [Jason's] position or in support of her Answer or Counterclaim," Jasmine's alimony be terminated effective February 1, and Jasmine be required to pay reasonable expenses and attorney fees incurred to obtain an order. An attached transcript prepared by a court reporter present for the January 25 deposition indicated the appearance of Jason's attorney and one of Jasmine's attorneys, and that Jasmine had not appeared. A "Notice of Hearing" included in the motion stated that the matter was set for hearing a week later on February 3. The certificate of service shows that one of Jasmine's third attorneys was electronically sent a copy of the motion. There was no service on Jasmine personally and there was no order entered by the court requiring Jasmine to personally appear at this hearing.

At the February 3, 2017, hearing on Jason's motion, Jason and his attorney were present. One of Jasmine's third attorneys was also present, and he indicated that neither Jasmine nor his "co-counsel" were present. The court noted the matter was before it on Jason's contempt motion for Jasmine's failure to attend her deposition. The following colloquy then took place.

> THE COURT: [Jasmine's attorney], do you have any preliminary matters?
>
> [Jasmine's Attorney]: Your Honor, at this time I'd move to allow an order for the Court to allow [cocounsel] and I to withdraw as counsel for [Jasmine]. We've had no contact with [Jasmine] since the scheduled deposition date and are limited to only contacting her by e-mail at this point. We cannot continue to represent her.
>
> THE COURT: Any objection, [Jason's attorney].
>
> [Jason's Attorney]: No, sir.
>
> THE COURT: All right. [Jasmine's attorney], I'll allow you and [cocounsel] to withdraw. If you'll get me an order to that effect, please.

- 4 -

[Jasmine's Attorney]: I'll do that, Judge.
THE COURT: You're excused.

The district court then proceeded to allow Jason's counsel to present evidence in support of his contempt motion, which consisted of the transcript reflecting Jasmine's failure to appear for her deposition on January 25. The district court took judicial notice of the January 18 order, and then asked Jason's attorney what he was requesting. Jason's attorney described the relief requested in his motion. The district court stated from the bench that it was granting the motion with respect to terminating alimony effective February 1, and also prohibiting Jasmine from presenting any evidence in opposition to Jason's position or in support of her answer or counterclaim. The district court then stated:

> I don't know how you're going to be collecting any fees or expenses from her. So I'm going to deny that without prejudice, if for some reason she shows up for trial on April 4, 2017, or if you try to get something in earlier for a prove-up, if she doesn't, if you can't find her.

When asked if there was anything else, Jason's attorney responded, "No Judge. But our intent is to schedule this matter now for a hearing in advance of the April 4 [sic]." The court directed Jason's attorney to prepare an order.

On February 6, 2017, an order was entered, noting the "oral motion" of Jasmine's third attorney to withdraw for himself and the noted cocounsel; the two attorneys were granted leave to withdraw as Jasmine's counsel. Notably, the certificate of service for this order reflects service only upon Jason's attorney and one of the third attorneys who had just been granted leave to withdraw. There is no indication of any manner of service upon Jasmine.

Four days later, on February 10, 2017, Jason's attorney filed an "Amended Notice of Trial," now advancing the previously scheduled April 4 trial date to March 13, at 1:30 p.m. The notice shows service on Jasmine at what appears to be a business email address. Specifically, the certificate of service states that "service has been accomplished through e-service and by e-mail to pro se Defendant, [Jasmine] at [business email address]" on February 10.

On February 13, 2017, an order was entered consistent with the court's verbal directives following the February 3 contempt hearing (terminating alimony effective February 1 and prohibiting Jasmine from presenting evidence). The order notes that trial was rescheduled for March 13, 2017, at 1:30 p.m. This order was prepared by Jason's attorney; no certificate of service is attached to this order.

On March 9, 2017, both of Jasmine's second attorneys filed motions to intervene for the purpose of protecting their interests in their claims for attorney fees. The notice of hearing indicated their motions would be heard on March 13. The certificate of service reflects service on Jasmine at the family residence (sold in October 2016) and by email at her business email address. On March 13, 2017, Jason and his attorney were present for trial. Also, Jasmine's female second attorney was present on behalf of both the second attorneys to take up their motions for intervention regarding attorney fees. Jasmine was not present, nor was anyone present on her behalf. The district court then took judicial notice that on February 10 Jason's attorney "sent notice of this trial to [Jasmine], I assume also to her then attorneys, which would be [third attorneys]. This matter comes

on for domestic prove-up then." (Contrary to the court's assumption, no notice was sent to the third attorneys on February 10; they had been allowed to withdraw on February 6.)

Jason proceeded to testify; no exhibits were offered in support of his testimony. Jason agreed the marriage was irretrievably broken, and that it was in the best interests of the children that they remain in his custody subject to Jasmine's "rights of supervised visitation." He indicated that Jasmine has had problems with drugs and alcohol, and that he should be allowed to select the person to supervise Jasmine's parenting time. Jason agreed that Jasmine had been receiving alimony for "about a year and a half," but he was asking the court to not award alimony because there was a concern that she used the alimony to purchase drugs. He claimed to not know Jasmine's present "whereabouts." Jason testified that the family home sold, with proceeds of $176,000 being held at a bank. He claimed that $75,196 of Jasmine's share of those proceeds should be paid to him for various items he contended he had to pay on her behalf. He stated that the "property out at Woodcliff," stocks from his grandmother's trust, and trusts set up by his parents, were not part of the marital estate and should be separately awarded to him. With regard to household goods, he said that Jasmine took "everything," and he estimated a value of $150,000 for those items. He testified that Jasmine was getting two motor vehicles (2015 Jeep Grand Cherokee and 2014 Mercedes Sprinter) worth $100,000, and he was getting a 2016 Ski Nautique boat and a Garia golf cart, together valued at $120,000. Jasmine was to receive a one-half interest in a 401K valued at "about $450,000." Each party was to keep whatever was in their own checking and savings accounts, and Jason claimed Jasmine had approximately $225,000 in jewelry. Each party was to pay his/her own debts, and Jason agreed that Jasmine should receive all interest in "Events In Bloom," and should pay any debts associated with it.

Jason testified about four reinsurance companies which Jason valued at $983,000. He claimed that Jasmine's "one-half less taxes" would be $358,795, which would be paid in an annual installment of $59,799.17 over a 6-year period.

Jason said he was aware of the liens filed by Jasmine's first and second attorneys, and stated that he would honor those liens. He claimed he had paid $175,000 towards Jasmine's "attorney fees, investigating fees and expert witness fees." He was going to receive back any sums that he had paid that were not used for expert witness fees. One of the second attorneys in attendance at the hearing indicated that she would be returning the expert fees only. Jason's attorney suggested that Jason was agreeable to advancing the amounts to pay the liens which would then be deducted from Jasmine's interest in the first reinsurance installment payment. Jason's attorney indicated he would "revise the decree" to address the attorneys' liens, and was directed by the court to include a "default parenting plan."

On March 15, 2017, a decree and "Default Parenting Plan" was entered consistent with the terms discussed at the March 13 hearing; a child support calculation was attached which continued to reflect a monthly gross income of $132,151 for Jason and $1,200 for Jasmine. The district court clerk's certificate of service attached to the decree shows email service on Jason's attorney and on Jasmine's male second attorney. Additionally, the "Notice of Judgment" issued by the district court clerk's office indicating a judgment had been entered on March 15 was mailed to the office addresses of Jason's attorney and to Jasmine's male second attorney.

On April 17, 2017, Jasmine filed a pro se "Answer and Counterclaim for Dissolution of Marriage (Children)." The certificate of service shows service by mail on Jason at his residence.

On April 28, Jasmine's female second attorney filed a "Receipt and Release of Lien" reflecting her receipt of $2,279.41 from Jason. The certificate of service on that document shows email service on Jason's attorney and on "Pittack, [Jasmine] represented by [male second attorney]." The male second attorney similarly filed a receipt and release of lien on May 1 reflecting his receipt of $37,122.50 from Jason. The certificate of service reflects separate email service on "[Jasmine] represented by" each of her second attorneys.

On December 29, 2017, with new counsel, Jasmine filed a "Motion to Set Aside or Vacate Judgment." She claimed that the decree should be set aside because: there was sufficient evidence before the district court to question whether Jasmine was a "person of sound mind," and therefore a GAL should have been appointed, but was not; she was "not properly noticed or served of the proceedings"; her counsel withdrew by order dated February 6 and she was not represented at trial and subsequent judgment; trial was advanced from April 4 to March 13 and notice was allegedly provided to Jasmine by email; the decree was obtained by fraud in that Jason failed to disclose all assets, gave "fraudulent statements concerning the characterization of assets as marital or non-marital," and gave "fraudulent testimony" regarding asset values and various expenses incurred; Jasmine did not discover "the fraud perpetrated upon her by [Jason] until the summer of 2017 and, in fact, through such time, [Jasmine] believed that she continued to be married to [Jason]." Jasmine alleged she had a "good and valid defense," noting specifically that the child support calculations show that Jason's monthly income is "one-hundred ten times that of [Jasmine]," and that Jasmine has "an actual need" for alimony, and the court's refusal to award her alimony results in permanent harm to her. She further claimed that the parenting plan did not comply with "the Nebraska Parenting Act."

A hearing on Jasmine's motion to vacate took place on March 5, 2018. Jason and his attorney were present. Jasmine was not present, but was represented by two attorneys. Jasmine's affidavit was received, with the exception of paragraph 10 (indicating Jason knew where Jasmine was living and could have contacted her by means other than email). Jasmine averred that she was aware of trial being scheduled for April 2017, but that she was never made aware of the March 2017 trial until after it happened. She claimed Jason did not disclose all of their assets, including at least $3 million in vehicles obtained during the marriage and a $100,000 boat purchased in 2013. She also alleged that while "the cabin" was purchased with funds from Jason's grandmother's trust, marital resources were used for remodeling. Jasmine pointed out Jason's monthly income of $132,151 and noted that he was not required to pay her alimony based only on his testimony that she would allegedly use such support for drugs. Finally, Jasmine stated that the parenting plan only allows her to see her daughters if Jason permits it, and that she has not seen her daughters since April 2017.

Jason's affidavit was also received. He pointed out Jasmine's history of lawyers, use of drugs, jail time, and her refusal to appear at his lawyer's office for her deposition on two occasions. He acknowledged that the family residence where Jasmine had been residing was sold in October 2016, but that she did not leave a forwarding address after moving out. He claimed he did not know where she was living, and that it was his understanding that Jasmine had been evicted from her "'shop.'" He denied Jasmine's allegations regarding the motor vehicles, the boat, and the cabin. He attached an email from Jasmine to him which reflected Jasmine's use of her business email on February 19, 2017, letting Jason know that someone had passed away, and also asking to "talk"

and to "see the girls please[.]" An affidavit from Jason's attorney's legal assistant was also received, indicating that on February 10, she emailed an "Amended Notice of Trial" to Jasmine at her business email address. The legal assistant also claimed to have emailed the divorce decree to Jasmine at her business email address on March 21. She claimed that neither email was returned to her as undeliverable.

A transcription of the March 5, 2017, hearing was also received, as well as copies of various other pleadings and orders. Jasmine's attorney argued that "Rule 6-111(a)(1) . . . service on a party who is not represented by counsel" requires that service be made "by delivering the paper to the person to be served." The attorney argued that there is no provision for serving a notice of trial by email on a pro se litigant; email is allowed if a person designates their email for service, but that Jasmine "certainly had not done that" and there was "nothing in the court file that reflects that she [had] consented to receive notice of hearings or anything else from the Court by e-mail."

Jasmine's attorney acknowledged the sanction by the court that would have precluded Jasmine from presenting evidence, but argued the sanction "would not have precluded her from at least cross-examining any witness who appeared." It was argued that "a full complement of the assets of the marriage was not presented to the Court," and reference was made to the "Special Collector Porsche" vehicles. Further, it was pointed out that Jasmine's third attorney had filed a request that someone be appointed under § 42-362 to represent Jasmine's best interests, but that request was denied despite "evidence over a year of problems," including Jason's own affidavit stating that Jasmine was on drugs, and an ex parte order based on evidence of "drug addiction or mental illness." Jasmine's attorney noted there was no particular definition for mental illness, but that "Black's Law Dictionary defines it as a disorder in thought or mood so substantial that it impairs judgment, behavior, perceptions of reality[,] or the ability to cope with the ordinary demands of life." The attorney added that "this court file is full of someone who is not coping with the ordinary demands of life."

Finally, Jasmine's attorney discussed Jason's testimony at trial that Jasmine should not be awarded alimony because Jason was afraid she would use it on drugs. The attorney stated, "That is not among the statutory factors that are used to determine whether a person is entitled to alimony or not." And with regard to the parenting plan, besides numerous required provisions not being included, Jasmine's attorney argued that a parenting plan "which says simply one parent has all the power to decide what happens with the children, does not comport generally with the Parenting Act" and its requirements. Also, the concern was raised that Jason was never asked at trial whether all the marital assets and debts were dealt with within the proposed decree, and that "an inequitable result has been had." Jasmine's attorney asked that the matter be re-opened, that some discovery be allowed, and that "a more equitable and appropriate award" be made.

Jason's attorney suggested that if Jasmine did not know about the new trial date, then "why wouldn't she have appeared in court on April 4, 2017 and gone to the bailiff and said, hey, what about - where's my trial on this? What happened?" He claimed Jasmine knew about the new trial date; "It was e-mailed to her. . . . So she got it." Jason's attorney discussed Jasmine's lack of cooperation, denied the allegations regarding the cars and the cabin, and claimed Jasmine did not "let us know where she's living" and then "doesn't do anything for nine months and then all of a sudden comes in and says, boy, this thing's not fair."

An order denying the motion to vacate was entered May 2, 2018. The order gave the names of Jasmine's prior attorneys and their dates of withdrawal, including the last two attorneys who were allowed to withdraw as of February 6, 2017. Noting that Jasmine was thereafter pro se, the court pointed out that a "pro-se litigant is held to the same standards as one who is represented by counsel, . . . and has a duty to comply with the court's procedural rules, including informing the court of his/her address and contact information." The order indicates that while Jasmine complained she did not received notice of the new March 7, 2017, trial date, "[t]here was no evidence presented that [Jasmine] appeared for the April 4, 2017 trial, which was within the appeal period of the March trial date should she wish to appeal the results of the domestic prove-up." The court also pointed out that "because of [Jasmine's] disobedience of this court's pretrial orders, she was precluded from offering any evidence in her case-in-chief at trial. Although she would have been able to cross-examine witnesses on her own behalf, as a pro-se litigant, she would have been severely disadvantaged in doing so." The court indicated that Jason served Jasmine with notice "the only way known to be reasonably assured of reaching her," which was her business email address which she herself had used on February 19, 2017. The court noted that when Jasmine filed her pro se answer and counterclaim, she provided her physical address as well as the business email address previously used to provide her notice of the amended trial date. The order stated that Jasmine's "suggestion that she did not get notice is disingenuous, and should be rejected." Regarding Jasmine's argument that she should have been appointed a GAL or attorney, the order stated that "there was no evidence presented . . . [that Jasmine] had a mental illness." The order goes on to state, "[Jasmine's] 'Motion For Order Under §42-362,' filed December 16, 2016, is not a motion to appoint [GAL] at all--rather it is a motion to appoint [Jasmine] an attorney because she apparently couldn't afford her current counsel, or a court-appointed attorney in the event [Jasmine] was mentally ill." The order then states:

> This court's Order of January 12, 2017, incorrectly styled the Order denying this request for relief as an Order denying [Jasmine's] motion for a GAL, which it was not. [Jasmine's] Motion, filed by her attorneys, did not indicate that [Jasmine] was unable to communicate with her attorneys, and there was no evidence presented of a diagnosed mental illness, and [Jasmine's] motion to vacate on that basis should be denied.

Regarding Jasmine's allegations that Jason committed fraud by concealing assets and with regard to alimony, the order states:

> There were multiple hearings regarding discovery, and [Jasmine] was provided additional funds to hire experts to discover and value assets, and had the opportunity to discover those facts during the nearly two years this case was pending.
>
> [Jasmine] also claims that the court erred by not awarding spousal support. Although there is a significant difference in income between the parties, [Jasmine] received over one million dollars in assets from the marital estate. There is no evidence that she cannot support herself, and [Jasmine's] Motion to Vacate should be denied.

Jasmine appeals from the district court's order denying her motion to vacate the decree.

## ASSIGNMENTS OF ERROR

Jasmine assigns error to the district court's denial of her motion to vacate or set aside the March 15, 2017, decree. Jasmine claims (1) she was improperly noticed as to trial and was never noticed as to the entry of the decree; (2) a GAL should have been appointed for her; (3) Jason failed to adequately disclose assets, constituting a fraud upon the court; (4) she should have been awarded alimony; and (5) the parenting plan does not comport with Nebraska law.

## STANDARD OF REVIEW

The decision to vacate an order at any time during the term in which the judgment is rendered is within the discretion of the court; such a decision will be reversed only if it is shown that the district court abused its discretion. *In re Change of Name of Whilde*, 298 Neb. 510, 904 N.W.2d 707 (2017). An abuse of discretion occurs when the trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*.

## ANALYSIS

### DISTRICT COURT HAD INHERENT POWER TO VACATE OR MODIFY DECREE

A court has inherent power to vacate or modify its own judgments at any time during the term at which those judgments are pronounced, and such power exists entirely independent of any statute. *In re Change of Name of Whilde, supra*. The district court for Douglas County is in the Fourth Judicial District, and under its local rules, the regular term of the court runs from January 1 through December 31 of each calendar year. See Rules of Dist. Ct. of Fourth Jud. Dis. 4-1 (rev. 1995). Jasmine's December 29, 2017, motion to vacate was filed within the same term as the district court's March 15 decree, therefore, the district court had the inherent authority to vacate or modify the decree. See, also, *Custom Fabricators v. Lenarduzzi*, 259 Neb. 453, 610 N.W.2d 391 (2000) (upon final adjournment of court, all business not otherwise disposed of shall stand continued generally; once motion is made and has not yet been ruled upon, motion is pending, and court retains jurisdiction by law to rule upon that motion); *Jarrett v. Eichler*, 244 Neb. 310, 506 N.W.2d 682 (1993) (if court has entertained motion to vacate and retains authority to rule on such motion within term, court has continuing authority to enter order vacating prior order even though term has subsequently expired).

### DISTRICT COURT ABUSED ITS DISCRETION BY DENYING MOTION TO VACATE

As set forth in the background section above, Jasmine provided the district court a number of reasons to support her motion to vacate the decree, and she makes similar arguments on appeal. These include the court's failure to appoint her a GAL despite continuing evidence of an apparent substance abuse problem, the withdrawal of Jasmine's attorneys and Jasmine's lack of notice that the trial date had been advanced, the failure by Jason to fully and accurately testify about the marital estate, the denial of alimony premised on accusations of how Jasmine would spend it, a deficient parenting plan which left decisions about Jasmine's parenting time inappropriately under Jason's exclusive control, and the failure to properly serve Jasmine notice that a divorce decree had been entered.

Rather than beginning our analysis addressing those errors specifically assigned by Jasmine, we first address a significant problem related to the withdrawal of Jasmine's third attorneys. Although Jasmine's appellate attorney refers to the withdrawal and Jasmine's failure to receive notice of the changed trial date, no specific error was assigned to the circumstances surrounding the withdrawal itself. However, plain error may be noted by an appellate court on its own motion. *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004). Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *Id*.

The record before us demonstrates a miscarriage of justice, in part brought on by Jasmine herself, but which more significantly was the result of an adversarial legal process in which litigants can suffer harsh consequences when they are without legal counsel to protect their interests. In this case, Jasmine's personal well-being, future support, and ability to spend time with her children were at stake, along with millions of dollars in marital assets. This was a 13-year marriage at the time the complaint was filed, and there was a disparity in gross income between the parties of almost $132,000 *per month*. Because of that disparity in income and the substantial marital estate, Jason was ordered to pay an initial $10,000 into Jasmine's first lawyer's trust account to cover attorney fees, plus an additional $25,000 to cover expenses for expert witnesses. When the second attorneys were retained, another $50,000 was put into a lawyer's trust account for attorney fees, and another $50,000 for expert fees. The decree and subsequent attorney lien releases indicate that an unknown amount of the latter unspent expert fees were to be returned to Jason, but the record is devoid of any explanation for the status of the funds in the attorney trust accounts being held for attorney fees. Unlike the expert fees, no mention is made that any remaining attorney fees would be returned to Jason. We take this to mean that there were no attorney fee funds remaining in the attorney trust accounts.

In addition to the attorney fees deposited into the attorney trust accounts during the pendency of the action, the record reflects that Jason paid another $39,401.91 to Jasmine's second attorneys after the decree was entered, for which Jasmine would be held accountable. Jason's payment to Jasmine for her share of the first annual installment of the reinsurance proceeds was to be reduced by the amount he paid to cover the remaining attorney fees. Therefore, almost $100,000 in attorney fees appear to have been paid for the benefit of legal representation on Jasmine's behalf, and she was represented by attorneys fairly consistently from September to December 2015 (first attorney), January to August 2016 (second attorneys), and September 2016 to February 2017 (third attorneys); yet she was not represented at a critical contempt hearing which resulted in the prohibition of her presentation of evidence at trial. Further, the trial date was changed and was advanced after Jasmine's third attorneys were permitted to withdraw from the case; Jasmine contends she was not made aware of the revised trial date, and was therefore not present nor represented at trial. As a result, none of the fruits of the $100,000 in attorney services, and an unknown amount of expert services, ever culminated in any final presentation of evidence to protect Jasmine's interests with regard to her personal well-being and future support, her ability to spend time with her children, and millions of dollars in marital assets.

Of significance to our plain error review, when one of Jasmine's third attorneys appeared at the February 3, 2017, contempt hearing (related to Jasmine's failure to appear for the January 25 deposition), the attorney orally motioned the court to allow himself and his cocounsel to

withdraw immediately preceding the commencement of the contempt hearing. Notably, Jasmine was not present. Nor does the record give any indication that Jasmine had been given advanced notice that her attorneys would be seeking to withdraw at that hearing, which was also just 2 months shy of the originally scheduled trial date. The Uniform District Court Rules of Practice and Procedure require notice to a client, specifically § 6-1510, which states, "Upon motion for withdrawal and notice to all counsel and the client involved, an attorney who has appeared of record in a case may be given leave to withdraw for good cause shown after filing with the clerk the motion, notice of hearing, and proof of service upon counsel and the client involved." The uniform rules govern the procedures in the district courts and they supersede any local rules of practice. The record before us does not reflect compliance with these requirements. See, also, Neb. Rev. Stat. § 25-910 (Reissue 2016) (where notice of motion is required, it must be in writing and served reasonable time before hearing on motion).

It is also unclear whether Jasmine was even aware of the February 3, 2017, hearing since the attorney making the oral motion to withdraw was the only person provided a notice of that hearing, and he informed the court that he had not had any contact with Jasmine since the scheduled deposition date (January 25). The notice of the February 3 hearing was not filed until January 27. There was absolutely no discussion at the February 3 hearing regarding notice being given to Jasmine either about the hearing itself or the third attorneys' oral motion to withdraw. But regardless of whether Jasmine was aware of the February 3 hearing, of greater significance is the fact that the record before us does not establish that Jasmine knew that her third attorneys would be asking to withdraw as counsel on that day. Without such notice, Jasmine was denied the opportunity to object to her attorneys' withdrawal at such a critical time or to ask for a reasonable period of time to find replacement counsel, which she had successfully done throughout the pendency of the action. There is nothing in the record to suggest that her changes in legal representation ever resulted in unnecessary delays in the proceedings.

Further, the February 6, 2017, order granting the "oral motion" to withdraw contains a certificate of service reflecting service only upon Jason's attorney and one of the third attorneys who had just been granted leave to withdraw. There is no indication that Jasmine was served with a copy of this order. And we also observe that the February 13 order prepared by Jason's attorney (which terminated Jasmine's alimony, set forth prohibitions regarding her presentation of evidence, and noted the rescheduled trial date of March 13) does not contain any certificate of service whatsoever. Therefore, in addition to Jasmine's assertion on appeal that she was not notified of the changed trial date, the record also reflects that Jasmine was not given proper advanced notice that her third attorneys were withdrawing on February 3, nor was she given notice that they had been allowed to withdraw. And importantly, the district court's February 13 order rescheduling the trial date to March 13 contained no certificate of service at all, and thus we can only conclude that no one, including Jasmine, was provided a copy of that order.

We also note that in the district court's order denying Jasmine's motion to vacate, the court states, "Each of the Motions to Withdraw which were filed notified [Jasmine] of the motions at [Jasmine's business email address]." This is not entirely correct, at least based on the record before us. The first attorney's motion to withdraw shows service on Jasmine at her business email address. The second attorneys' motions to withdraw show service on Jasmine at her residential address and her business email address. The third attorneys did not file a motion to withdraw; rather, as

- 12 -

discussed, they orally motioned to withdraw at the February 3, 2017, hearing, and there is no record of Jasmine being notified of that oral motion.

Due to there being no record that Jasmine was notified in advance of the third attorneys' oral motion to withdraw, we can only conclude that Jasmine was provided no opportunity to object to that withdrawal or otherwise request a continuance to obtain new counsel. With Jason's contempt motion immediately pending and trial fast approaching, it was important that Jasmine have proper notice and an opportunity to be heard with regard to her need for legal representation at such a critical time. The interests at stake for Jasmine were significant, including her constitutional right to have access to her children. The fundamental liberty interest of natural parents in the care, custody, and management of their child is afforded due process protection. *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004). Also, if a significant property interest is shown, due process requires notice and an opportunity to be heard that is appropriate to the nature of the case. *Prime Realty Dev. v. City of Omaha*, 258 Neb. 72, 602 N.W.2d 13 (1999). Due process does not guarantee an individual any particular form of state procedure; instead, the requirements of due process are satisfied if a person has reasonable notice and an opportunity to be heard appropriate to the nature of the proceeding and the character of the rights which might be affected by it. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018). The determination of whether procedures afforded an individual comport with constitutional requirements for procedural due process presents a question of law. *Id.*

We conclude that given the substantial interests at stake, it was essential for Jasmine to be given reasonable advanced notice of the third attorneys' oral motion to withdraw, and an opportunity to object to their withdrawal or to request a reasonable period of time to seek new counsel in light of the pending contempt proceeding and upcoming trial. Failure to provide such notice and opportunity deprived Jasmine of due process in a matter critical to the protection of her interests related to her children, her own well-being, her future support, and millions of dollars in marital assets. Accordingly, any orders entered by the district court after February 6, 2017, in which Jasmine was not represented by counsel in the proceeding leading to the order should be vacated, specifically, the February 13 order setting forth contempt sanctions and the March 15 decree.

In light of our decision on plain error grounds, we need not reach the other errors specifically assigned by Jasmine. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Ray Anderson, Inc. v. Buck's, Inc.*, 300 Neb. 434, 915 N.W.2d 36 (2018).

CONCLUSION

We reverse the district court's order denying the motion to vacate, and remand with directions for the district court to vacate any orders it entered after February 6, 2017, in which Jasmine was not represented by counsel in the proceeding leading to the order, specifically, the February 13 order setting forth contempt sanctions and the March 15 decree, and to schedule the case for further proceedings.

REVERSED AND REMANDED WITH DIRECTIONS.